**STATE of Missouri, Respondent,**

v.

**Charles Lee RUTTER, Appellant.**

No. SC 84518.

Supreme Court of Missouri,
En Banc.

Dec. 24, 2002.

Rehearing Denied Jan. 28, 2003.

John W. Peel, Terry J. Flanagan, St. Louis, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for respondent.

RICHARD B. TEITELMAN, Judge.

Appellant, Charles Lee Rutter, appeals from a judgment of the Circuit Court of Iron County following a jury conviction of murder in the first degree, section 565.020, and armed criminal action, section 571.015.[1]

After opinion by the Court of Appeals, Southern District, the case was transferred to this Court.[2] *Mo. Const. art. V, section 10.*

The sufficiency of the evidence supporting Appellant's convictions is not in dispute. This appeal concerns seven of the trial court's rulings on: (1) admissibility of evidence seized without a warrant (testimony of two police officers as to what they observed during inspections of a closet at the crime scene); (2) unlimited expert qualification of a defense witness; (3) foundation for expert testimony from State witness' testimony as to bullet patterns; (4) foundation for expert testimony from a State witness' testimony as to the effects of a drug found in the victim's system; (5) erroneous testimony provided by a State witness as to whether Appellant was in possession of illegally obtained prescription medicine; (6) evidence of the victim's past acts of violence; and (7) submission of a voluntary manslaughter instruction to the jury.

All seven points are denied. Appellant is correct that the trial court erred in admitting evidence obtained in the officers' warrantless searches of the closet, but Appellant was not prejudiced by the error. On the other six points raised by Appellant, the trial court did not err.

### Facts

■ The facts and reasonable inferences from such facts are considered favorably to the trial court's ruling and contrary evidence and inferences are disregarded. *State v. Galazin,* 58 S.W.3d 500, 507 (Mo. banc 2001).

In the morning of April 4, 1999, Appellant and Michael Hinkle were alone together in Appellant's house. Some time that morning, Appellant used a pistol to shoot Michael Hinkle in the back of the head, killing him.

Appellant did not call the police. After authorities were eventually notified several hours later, Deputy Helton of the Iron County sheriff's department was dispatched to "a shooting" at Appellant's residence. He arrived between 1:30 p.m. and 2:00 p.m. There were approximately 20

---

1. All statutory references are to RSMo 2000.

2. Portions of that opinion are incorporated without further attribution.

people outside the residence, many of whom had already been inside. Deputy Helton was met by ambulance personnel who informed him that the only individual inside the house was the victim, who had been fatally shot.

Without consent or a warrant, Deputy Helton entered Appellant's residence to learn if the victim was still alive and the location of the body. He found Hinkle's dead body in the bathtub. Deputy Helton saw evidence of a struggle in the living room—the television and stereo were overturned, the lights and windows were broken. There was a large damp blood stain in the living room carpet near a closet and bloody marks leading into the bathroom. Deputy Helton and the others all departed the house. He observed Appellant outside the residence and ordered him not to leave. Deputy Helton then secured the house by placing sheriff's tape around the back door. He was satisfied that the house was unoccupied and secure.

At approximately 2:00 p.m., Deputy Ivy arrived at the scene. At approximately 2:06 p.m., Deputy Young arrived. Without consent or a warrant, Deputies Helton, Ivy and Young reentered Appellant's residence and conducted a search for evidence. They photographed the entire area and took a carpet sample. They photographed and seized a pistol on a chair in the living room and a shell casing at the doorway to the living room closet. The shell casing was visible to those standing in the living room, without the aid of a flashlight. The door to the closet was open, and it was dark inside. Deputy Helton looked around inside the closet with the aid of a flashlight, but did not enter it. He did not see firearms or any other evidence in the closet. At approximately 2:30 p.m., Deputy Young inspected the closet with a flashlight, crawling into it on his hands and knees. Deputy Young believed he was searching for evidence. There was a garment hanging in the left side of the closet. Deputy Young examined the entire closet, but found no weapons or other evidence. He measured the interior of the closet at 4 feet 3 1/2 inches by 3 feet 3 3/8 of an inch.

The officers all departed by 5:00 p.m. and released the home to Appellant's family, who boarded up broken windows and removed valuable property.

At 12:01 a.m. the next morning, Deputy Helton obtained a search warrant to search Appellant's residence again. He then returned to the residence and collected more evidence, including photographs, carpet and blood samples.

Appellant was charged with murder in the first degree, a violation of section 565.020, and armed criminal action, a violation of section 571.015. The State waived its right to seek the death penalty.

Appellant filed a pre-trial motion to suppress evidence, arguing that the warrantless searches violated Appellant's Fourth Amendment rights. The motion was overruled following a hearing.

In his opening statement, Appellant's counsel acknowledged that Appellant killed Hinkle. He told the jury that Appellant would testify that, after an argument, Hinkle launched into a violent fury in which Hinkle significantly damaged Appellant's property and physically assaulted Appellant. Then, according to Appellant, Hinkle announced that he was going to kill Appellant and started towards the closet, which Appellant alleges contained two rifles and a loaded shotgun. Appellant's counsel told the jury that Appellant would testify that he then shot Hinkle because he believed Hinkle would grab a gun from the closet to kill him. He told the jury to expect the defense to present witnesses who would testify that they observed weapons in the

closet after the police released the crime scene.

In its case-in-chief, the State presented testimony of the deputies as to all evidence seized both before and after the issuance of the warrant. This included testimony from Deputies Helton and Young that they did not observe weapons in the closet and that they inspected it carefully enough to be sure. Appellant's continuing objection to the admissibility of the evidence seized without a warrant was overruled. The State presented the testimony of Dr. Russell Deidiker, a physician who conducted an autopsy of Hinkle. Over Appellant's objections, Dr. Deidiker was allowed to testify as an expert as to a bullet pattern comparison used to determine the distance from which Hinkle was shot and as to the effects of the drug Butalbital that was found in Hinkle's system at autopsy. The State also presented the testimony of Tony Cole, the Iron County coroner, that he retrieved a bottle of prescription medicine from Appellant's home bearing the name of one of Appellant's relatives. From this testimony, the State attempted to make an inference at trial that Appellant had illegally obtained the prescription medicine in his relative's name.

During an in-camera hearing, Appellant presented testimony from Steven Craigmiles, who claimed to be a victim of a past specific act of violence on the part of Hinkle. Appellant testified that because of his knowledge of this incident he had been fearful of Hinkle when he allegedly acted in self-defense. The trial court sustained the State's objection to testimony of the specific act of violence against Craigmiles, but permitted Appellant to present to the jury evidence of Hinkle's reputation for violence in the community.

In his case-in-chief, Appellant testified as indicated in his opening statement. Appellant presented two rifles and a shotgun as exhibits. Appellant presented the testimony of six witnesses who testified that they were at the crime scene after the shooting and either observed the guns in the closet or observed the guns being removed from the house. Appellant presented Dr. Terry Martinez as a witness, but the trial court sustained the State's objection to qualification of Dr. Martinez as an unlimited expert. Dr. Martinez testified as to the possible effects of Butalbital, a drug found in Hinkle's system at autopsy.

As a rebuttal witness, the State presented testimony from Hinkle's grandmother that Appellant had told her a week to ten days before the shooting that all guns except the pistol used to shoot Hinkle had been removed from Appellant's residence.

The jurors were advised by their instructions that they could find Appellant guilty of murder in the first degree or murder in the second degree. The trial court refused Appellant's request to submit a jury instruction on voluntary manslaughter. However, the trial court did instruct the jury on self-defense. The jury returned a verdict that Appellant did not act in self-defense, finding him guilty of first-degree murder and armed criminal action. Appellant was sentenced to concurrent terms of life imprisonment.

Appellant filed a motion for new trial. At the motion hearing, Appellant presented Cole, who testified that he had erroneously testified at trial as to the name on the seized prescription bottle, when, in fact, he had come to believe the Appellant's name was on the bottle. Appellant also repeated his Fourth Amendment arguments concerning the evidence seized without a warrant. The trial court overruled the motion for new trial.

### I. Warrantless search and seizure

Appellant has narrowed his original Fourth Amendment argument, conceding

that much of the evidence seized without a warrant was in plain view.[3] He now argues that the trial court erred in admitting the testimony of Deputies Helton and Young regarding observations made (and therefore evidence seized) during their warrantless searches of Appellant's closet. Appellant argues that there was no applicable exception to the search warrant requirement.

Appellant, having raised the issue in a pre-trial motion to suppress, stated the objection at trial and repeated the issue in his motion for new trial properly preserved the issue of the admissibility of the evidence obtained during the warrantless searches of the closet. Therefore, the question on appeal is whether there was error so prejudicial that it deprived Appellant of a fair trial. *Deck*, 68 S.W.3d at 427; *State v. Storey*, 40 S.W.3d 898, 903 (Mo. banc 2001).

The State does not dispute that the police officers' inspections of the closet were conducted in Appellant's home without consent or a warrant.

■ The Fourth Amendment to the United States Constitution provides that the "right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated...." *U.S. Const. amend. IV.*[4] Warrantless searches and seizures inside a home are presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980).

### A. Exigent circumstances

■ The State can overcome the presumption that a warrantless search and seizure is unreasonable by showing that it falls within one of a carefully defined set of exceptions, many of which are based on the presence of exigent circumstances.[5] *Id.* at 587; *United States v. Conner*, 127 F.3d 663, 666 (8th Cir.1997).

Appellant correctly concedes that Deputy Helton's first entrance into Appellant's home was done under exigent circumstances—to verify the status of the victim. However, the inspections of the closet occurred after Deputy Helton secured the crime scene and reentered the home. Appellant argues that any exigency was extinguished by that time. The State argues that the officers' observations of the closet

3. Additionally, Appellant conceded that he shot Hinkle, so any error as to the admissibility of evidence merely tending to indicate that he shot Hinkle was not prejudicial.

4. The Missouri Constitution provides:
That the people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures; and no warrant to search any place, or seize any person or thing, shall issue without describing the place to be searched, or the person or thing to be seized, as nearly as may be; nor without probable cause, supported by written oath or affirmation. *Mo. Const. art. I, section 15.* Appellant maintains that the warrantless searches and seizures also violate this protection, but he does not maintain that there is any meaningful difference between this provision and the Fourth Amendment to the United States Constitution.

5. For example, a warrantless intrusion may be justified by hot pursuit of a fleeing felon, imminent destruction of evidence, need to prevent a suspect's escape, or risk of danger to the police or to other persons inside or outside the dwelling. *Minnesota v. Olson*, 495 U.S. 91, 100, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990). Exigent circumstances should rarely be sanctioned when there is probable cause to believe that only a minor offense has been committed. *Welsh v. Wisconsin*, 466 U.S. 740, 753, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984). There is no "murder scene exception" to the warrant clause of the Fourth Amendment. *Flippo v. West Virginia*, 528 U.S. 11, 14, 120 S.Ct. 7, 145 L.Ed.2d 16 (1999).

occurred under two exigent circumstance exceptions: the evidence was observed by the officers because it was in plain view when the officers were properly in the home due to exigent circumstances or the evidence was observed as part of a protective sweep of the home. The State also asserts that, even if the evidence was not seized from plain view or during a protective sweep, it was admissible either under the inevitable discovery rule or because Appellant waived his privilege to assert an exclusionary rule.

### B. Plain view

■ The State argues that the evidence seized without a warrant is admissible because the closet was in plain view to Deputy Helton when he was in the home under exigent circumstances.

■ "The 'plain view' exception to the Fourth Amendment warrant requirement permits a law enforcement officer to seize what clearly is incriminating evidence or contraband when it is discovered in a place where the officer has a right to be." *Washington v. Chrisman*, 455 U.S. 1, 5–6, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982).

> [A] person's reasonable expectation of privacy diminishes as to items that are readily visible in an otherwise private location into which police are invited or a public location to which all have access. Under this exception, an officer who is lawfully located in a place from which the object can plainly be seen may seize the object so long as there is probable cause to believe that the object is connected to the crime.

*State v. Johnston*, 957 S.W.2d 734, 742 (Mo. banc 1997). In *Johnston*, this Court held that a pistol was admissible under the

plain view exception because it was "easily seen," "[n]othing had to be moved to see ... or to retrieve it" and it could have been the murder weapon. *Id.* at 743–744. However, a rifle was held inadmissible because it was under the living room sofa and not visible, and bloody jeans found under a bed were held inadmissible because their discovery occurred only after police moved the bed. *Id.* at 744.

To establish the plain view exception, the burden is on the State to prove by a preponderance of the evidence that the evidence obtained in the searches was readily visible, plainly or easily seen.[6]

Two distinct searches of the closet are at issue in this case. First, Deputy Helton inspected the closet. His inspection was of more than what was easily seen from the living room—it was sufficient for him to reach a conclusion about the closet's contents in detail. He inspected it thoroughly enough to be confident that he would have seen any guns. It was light enough in the living room to see a shell casing on the floor in front of the closet. However, it was dark in the closet, and Deputy Helton needed to use a flashlight. These circumstances are insufficient to establish by a preponderance of the evidence that Deputy Helton's observations were readily visible, plainly or easily seen.

Second, Deputy Young inspected the closet. He measured its internal dimensions and crawled into it on his hands and knees with a flashlight. He examined the entire closet. Instead of being evidence that was easily seen, Deputy Young's observations from the inside of the closet were the result of a thorough and laborious search for evidence. These circum-

---

6. The State must also prove by a preponderance of the evidence that there was probable cause to believe that the evidence was connected to the crime, but that is not disputed by Appellant, who admits telling several people at the crime scene his self-defense theory involving guns in the closet.

stances are also insufficient to establish by a preponderance of the evidence that Deputy Young's observations were readily visible, plainly or easily seen.

The evidence seized in the course of these two searches of the closet was not admissible under the plain view exception.

### C. Protective sweep

■ The State also argues that the evidence was admissible because the officers were permitted to conduct a "protective sweep"—a search of the house for other possible victims or accomplices.

■ "The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others." *Warden v. Hayden*, 387 U.S. 294, 298–299, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).

> [T]he Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid. Similarly, when the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises.

*Mincey v. Arizona*, 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).

■ "[A] 'protective sweep' is justified in connection with an in-home arrest if an officer reasonably believes that the area to be swept harbors an individual posing a danger to those at the arrest scene." *United States v. Boyd*, 180 F.3d 967, 975 (8th Cir.1999). The officer's reasonable belief must be based on specific and articulable facts. *Id.* In *Boyd*, the Eighth Circuit found appropriate a protective sweep that included a cursory visual inspection of a closet, because "a person might have been hiding there," and the officers had no way of knowing how many people were in the house. *Id.* at 975–976.

■ In *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), the United States Supreme Court held:

> As an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, ... there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.... [S]uch a protective sweep, aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found. The sweep lasts *no longer than is necessary* to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises.

*Id.* at 334–336, 110 S.Ct. 1093.

In *Johnston*, this Court held that the seizure of a shotgun was appropriate under the protective sweep exception because it was in a closet, the police had been told that a young child could be in the home, the perpetrator had claimed that unapprehended *motorcycle gang members committed* the crime and the shotgun could have been the murder weapon. *Johnston*, 957 S.W.2d at 744.

In this case, Deputy Helton had already observed Appellant outside the home.

When the two searches of the closet occurred, both deputies believed the house to be secure and unoccupied. The State has the burden to establish that the officers had reasonable beliefs that there was some danger. Here, the deputies acknowledged they had no such fear. They knew that Appellant was outside the house, there was no working theory that would have included any additional victims or perpetrators, and they believed the house to be secure and unoccupied. These circumstances cannot justify the admission of evidence obtained without a warrant under the protective sweep exception.

### D. Inevitable discovery

■■■ The State argues that, even if the testimony in question was not the result of a lawful search, it was still admissible under the inevitable discovery doctrine because the evidence in question would have been discovered through other lawful means in that a search warrant was obtained eventually.

■■■■ As an exception to the exigent circumstances rule, where law enforcement personnel would ultimately or inevitably have discovered evidence, the evidence is admissible notwithstanding a constitutionally invalid search. *State v. Milliorn,* 794 S.W.2d 181, 184 (Mo. banc 1990). Under this doctrine, illegally seized evidence may be admitted if the State proves by a preponderance of the evidence: (1) that certain standard, proper and predictable procedures of the local police department would have been utilized, and (2) those procedures inevitably would have led to discovery of the challenged evidence through the State's pursuit of a substantial, alternative line of investigation at the time of the constitutional violation. *Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *Boyd,* 180 F.3d at 976; *United States v. Glenn,* 152

F.3d 1047, 1049 (8th Cir.1998); *Conner,* 127 F.3d at 667; *Milliorn,* 794 S.W.2d at 184; *State v. Butler,* 676 S.W.2d 809 (Mo. banc 1984). The inevitable discovery analysis cannot involve speculation and must focus on demonstrated historical facts capable of ready verification or impeachment. *Milliorn,* 794 S.W.2d at 186.

In this case, the State presented no evidence of its routine procedures other than what occurred. The officers did not express that there was any impediment to their normal procedures. They secured the crime scene, conducted a thorough search, seized evidence, released the home to the suspect's family and only then began work on obtaining a search warrant. The officers' observations of Appellant's closet were primarily relevant because of the timing of the observations. If the officers had inspected the closet after the warrant was issued, any observations of a lack of weapons in the closet would have been consistent with the testimony offered by Appellant's witnesses. There is no evidence suggesting that, if the officers had waited to inspect the closet until a warrant was issued, they would not have first released the house to Appellant's family to remove valuables such as guns. Consequently, there is no evidence to support a finding that certain standard and predictable procedures would have been employed and inevitably would have led to discovery of the evidence. There is also no evidence that the State was actively pursuing a substantial, alternative line of investigation at the time of the warrantless searches.

Thus, the inevitable discovery doctrine cannot justify admission of the evidence obtained in the warrantless searches of the closet.

### E. Waiver

■■■ The State argues that, even if the evidence was illegally seized as discussed

above, it was still admissible because Appellant waived any right to have the evidence excluded by telling the jury in his opening statement that he intended to present testimony on the subject.

 When a defendant testifies, he must testify truthfully or suffer the consequences. *United States v. Havens,* 446 U.S. 620, 626, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980). A criminal defendant does not have the right to commit perjury. *Harris v. New York,* 401 U.S. 222, 225, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). Evidence obtained in an illegal search is inadmissible in the State's case-in-chief, but may be admitted as rebuttal evidence to impeach testimony of the defendant. *Havens,* 446 U.S. at 624, 100 S.Ct. 1912. This effectuates a delicate balance of competing interests—the deterrent function of the Fourth Amendment exclusionary rules against the fact-finding goals of a criminal trial. *Id.* at 627, 100 S.Ct. 1912. While acknowledging the public policy need for the exclusionary rules, the *Havens* Court expressed concern for both the importance of arriving at truth in criminal trials and a defendant's obligation to speak the truth in response to proper questions. *Id.* at 626, 100 S.Ct. 1912. When a defendant's testimony is inconsistent with constitutionally excluded evidence, he has waived his privilege to continue to assert an exclusionary rule as to the evidence.

In this case, the State seeks to expand the holding of *Havens* beyond a defendant's testimony to include a defendant's opening statement. "The primary purpose of an opening statement is to inform the judge and jury of the general nature of the case, so they may appreciate the significance of the evidence as it is presented." *State v. Thompson,* 68 S.W.3d 393, 394

(Mo. banc 2002). "[A] party is not confined in his evidence to the proof of facts recited in the opening statement." *Hays v. Missouri Pac. R. Co.,* 304 S.W.2d 800, 804 (Mo. banc 1957). An opening statement is not evidence.[7] *State v. Madison,* 997 S.W.2d 16, 21 (Mo. banc 1999); *State v. Payne,* 958 S.W.2d 561, 565 (Mo. banc 1997).

 When evidence is inadmissible because it is not relevant, it can nevertheless become admissible because a party has opened the door to it with a theory presented in an opening statement. Therefore, a defendant's opening statement can open the door to evidence of a prior crime. *Bucklew v. State,* 38 S.W.3d 395, 401 (Mo. banc 2001). A defendant's theory presented in an opening statement can render the otherwise irrelevant testimony of the State's medical expert relevant and admissible to contradict the theory. *State v. Skillicorn,* 944 S.W.2d 877, 891–892 (Mo. banc 1997).

Unlike the inadmissibility of irrelevant evidence, the exclusion of evidence seized in violation of the Fourth Amendment is a judicially-created rule that furthers a public policy concern. The United States Supreme Court's holding in *Havens* expresses a competing concern that the State have an opportunity to rebut *evidence* presented by a defendant's possibly untrue testimony. An opening statement is not evidence. Therefore, it presents no such concern. Opening statements do not present a risk that the State will be prevented from rebutting perjured testimony of a defendant.

The *Havens* balance of competing interests allows the admission of the illegally obtained evidence in response to a defendant's testimony, and not earlier. Given

---

7. In this case, the trial court properly instructed the jury that "opening statements of attorneys are not evidence."

that evidence seized inside a home without a warrant is presumptively inadmissible, there is no compelling reason to expand the *Havens* waiver rule to include a defendant's opening statement.

The State notes that Appellant testified as to the contents of the closet, and that Appellant presented witnesses who testified as to the contents of the closet. While a defendant cannot be held responsible for the testimony of other witnesses, his testimony would have triggered the State's right to have the evidence admitted in rebuttal. However, that did not occur because the evidence had already been presented. Regardless of what happened later in the trial, the *Havens* waiver rule could not have been applied to the State's case-in-chief, and it was error to admit the evidence at that stage.

Therefore, the evidence of the observations of Deputies Helton and Young as to the contents of the closet was seized in violation of the Fourth Amendment, no exceptions applied, and it was error to allow the State to present the evidence in its case-in-chief.

### F. Prejudice

"Trial court error does not require reversal unless there is a reasonable probability that the trial court's error affected the outcome of the trial." *Johnston*, 957 S.W.2d at 744; *State v. Cook*, 628 S.W.2d 657 (Mo. banc 1982). Otherwise, the error is not prejudicial. *Id.*

The existence or non-existence of weapons in the closet was integral to Appellant's claim that he acted in self-defense. The testimony of the officers that they did not observe weapons in the closet undercut Appellant's self-defense theory. However, Appellant's theory was also undercut by other evidence that was legally obtained and presented to the jury—the testimony of Hinkle's grandmother.

Appellant's testimony also could have undercut his self-defense theory. "One who unreasonably believes that he must use force to defend himself from an imminent attack or uses an unreasonable amount of force cannot escape conviction on grounds of self-defense." *State v. Redmond*, 937 S.W.2d 205, 209 (Mo. banc 1996). Appellant testified that, while Hinkle was turned away from him reaching into the closet, Appellant pulled out a pistol, got up out of his chair, walked over to Hinkle and shot him in the back of the head at close range. Appellant did not claim to have warned Hinkle that he had a pistol or that he would shoot. Nor did he claim to have fired a warning shot or to have first tried any of a variety of less forceful options. A reasonable juror could have believed Appellant's testimony, disbelieved the deputies' testimony that there were no guns in the closet, yet still found that Appellant did not act in self-defense.

Appellant does not dispute that he killed Hinkle, and there was overwhelming evidence that he did so. As Appellant is the only living witness to the events that immediately preceded his shooting of Hinkle, he was compelled to testify in order to present his self-defense theory. He could not present a plausible self-defense theory without some mention of his belief as to the contents of the closet. Therefore, he could not have presented his self-defense theory without inevitably allowing the State to invoke the *Havens* waiver rule and rebut his testimony with the illegally obtained evidence consisting of the deputies' observations of the closet. Regardless of the trial court's error in allowing the disputed evidence to be presented in the State's case-in-chief, the evidence would have been admissible as rebuttal evidence had the trial court not erred. There is no reasonable probability that the

State's presentation of the evidence in its case-in-chief as opposed to rebuttal changed the verdict. Therefore, the trial court's Fourth Amendment error was not prejudicial.

## II. Testimony of Dr. Martinez

■ Appellant next argues that the trial court erred in refusing the offer of Dr. Martinez as an expert and in declaring him not an expert in that Appellant argues that a proper foundation was laid for the expert testimony.

■ The qualifications of a witness to render an expert opinion lie within the trial court's discretion. *State v. Brown,* 998 S.W.2d 531, 549 (Mo. banc 1999); *Mehra v. Mehra,* 819 S.W.2d 351, 355 (Mo. banc 1991). A trial court will be found to have abused its discretion when a ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *State v. Brown,* 939 S.W.2d 882, 883 (Mo. banc 1997).

The record indicates that Appellant offered Dr. Martinez as an unlimited expert "for testimony here today." The trial court properly sustained the State's objection to the qualification of Dr. Martinez as an unlimited expert and indicated that it would consider Dr. Martinez's qualifications as to each question posed. The trial court properly ruled that Dr. Martinez could testify on matters within his expertise and that he could not testify on matters outside his expertise. Appellant's contention that the trial court expressly declared to the jury that Dr. Martinez was not an expert is unsupported by the record.

## III. Testimony of Dr. Deidiker as to bullet patterns

■ At trial, the State presented the testimony of Dr. Deidiker, a physician trained in pathology. Dr. Deidiker testified that he conducted an autopsy upon Hinkle. He also testified about his review of a Missouri State Highway Patrol criminalist's bullet patterning test results and his opinion that Hinkle was shot by Appellant from a distance of four to eight inches.

Appellant argues that the trial court erred in allowing the admission of Dr. Deidiker's testimony of bullet pattern comparison in determining the distance between the weapon and Hinkle at the time of the shooting. Appellant maintains that this opinion as to distance was based solely upon the criminalist's testing of bullet patterning and that the testing was conducted horizontally, while the evidence presented at trial established that the weapon was fired at an angle.[8] Appellant argues that Dr. Deidiker's testimony as to the distance from which Hinkle was shot was admitted without proper foundation.

As stated above, the qualifications of a witness to render an expert opinion lie within the trial court's discretion. *Brown,* 998 S.W.2d at 549; *Mehra,* 819 S.W.2d at 355. A trial court will be found to have abused its discretion when a ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *Brown,* 939 S.W.2d at 883.

The trial court did not abuse its discretion in allowing Dr. Deidiker to testify regarding the bullet patterning results.

8. The State's criminalist performed various tests firing the pistol at numerous targets to show varying patterns of burned and un-burned gunpowder that resulted when the pistol was discharged at different distances and angles.

Dr. Deidiker testified that he was a physician trained in anatomical, clinical and forensic pathology and that he had performed between 600 and 700 autopsies. His testimony regarding the bullet patterning test was based on his previous training and experience, notwithstanding that it was partially based on his review of the criminalist's records.

## IV. Testimony of Dr. Deidiker as to Butalbital

■ Dr. Deidiker also testified that a drug found in Hinkle's body (Butalbital) would have caused sedation and drowsiness rather than excited or violent behavior.

Appellant argues that the trial court erred in allowing the admission of Dr. Deidiker's testimony as to the specific effects of Butalbital. Appellant maintains that Dr. Deidiker was not qualified to reach any such conclusions and, therefore, the evidence was without proper foundation.

There is no reason to dispute the logic of the trial court's discretionary ruling that Dr. Deidiker was qualified to render an opinion regarding the effects of Butalbital on a person. In addition to being a medical doctor, Dr. Deidiker testified that he was familiar with literature regarding Butalbital and its effects on people. Even assuming, arguendo, that this testimony should have been excluded, it was cumulative to that of another of the State's expert witnesses, a forensic toxicologist.

## V. Testimony of Tony Cole

■ Appellant argues that the trial court erred in not granting Appellant's motion for new trial based upon the post-trial testimony from Cole that he had erroneously testified at trial that Appellant had been in possession of a prescription bottle with a relative's name on it.

To warrant a new trial based on post-trial newly discovered evidence, the defendant must show: (1) the evidence has come to the knowledge of the defendant since the trial; (2) it was not owing to want of due diligence that it was not discovered sooner; (3) the evidence is so material that it would probably produce a different result on a new trial; and (4) it is not cumulative only or merely impeaching the credibility of the witness. The trial court has substantial discretion in ruling on a motion for a new trial based upon newly discovered evidence, and we will not disturb its decision absent an abuse of discretion.

*State v. Whitfield,* 939 S.W.2d 361, 367 (Mo. banc 1997) (citations omitted).

Appellant argues that Cole's erroneous testimony at trial was critical to the State's case and played an instrumental role in the jury's arriving at a guilty verdict, because the State argued at trial that Appellant illegally obtained a false prescription.

However, Appellant fails to satisfy the fourth part of the *Whitfield* test—that the evidence is not cumulative only or merely impeaching the credibility of the witness. *Id.* The evidence is cumulative of Appellant's testimony at trial that he did not illegally obtain the prescription. Also, Cole's testimony at the post-trial motion hearing did nothing more than impeach the credibility of his previous testimony, and Appellant had already effectively cross-examined Cole at trial.

Appellant has failed to establish that the trial court abused its discretion in overruling Appellant's motion for new trial.

## VI. Evidence of victim's past acts of violence

■ At trial, during an in-camera hearing, Appellant presented testimony from Craigmiles and himself as to Hinkle's past

acts of violence. Craigmiles testified about an incident that occurred a year before Appellant shot Hinkle, in which Hinkle punched Craigmiles in the face three times without provocation. Appellant then testified that Hinkle had told him about the encounter with Craigmiles, bragging that he had "kicked [Craigmiles'] butt." Appellant testified that he was fearful of Hinkle because of this incident.

The trial court sustained the State's objection to testimony of the specific act of violence against Craigmiles. However, the trial court stated that it would permit evidence of Hinkle's reputation for violence in the community. Later, at trial, Appellant reiterated his offer of proof of Craigmiles' testimony, which was again rejected by the trial court.

Appellant argues that the trial court erred in refusing to allow him to present evidence of specific acts of violence by the victim. He maintains that the evidence was admissible in order to establish and support Appellant's fear and apprehension of the victim, which was essential to his claim that he acted in self-defense.

 A trial court is not required to admit all evidence proffered about a victim's prior specific acts of violence. *State v. Waller*, 816 S.W.2d 212, 216 (Mo. banc 1991). When other competent evidence has raised the question of self-defense, the trial court must exercise caution in discretionary rulings that permit a defendant to introduce evidence of a victim's prior specific acts of violence: (1) for which the defendant has laid a proper foundation; (2) of which the defendant had specific knowledge; (3) that are reasonably related to the crime with which the defendant is charged; (4) that are not too remote in time; (5) that are of quality such as to be capable of contributing to the defendant's fear of the victim; and (6) that are not of quality substantially different from the act

that the defendant accuses the victim of committing. *Id.*

Appellant testified at the hearing that his only knowledge of Hinkle's alleged assault of Craigmiles came directly from Hinkle, was brief, and provided little detail of the incident. Appellant has not demonstrated that he was sufficiently aware of a specific act of violence against Craigmiles by Hinkle. Nor was the proposed testimony of sufficient quality to reasonably show that Appellant had reason to fear Hinkle would kill him. The trail court did not err in sustaining the State's objection to the proposed evidence.

## VII. Voluntary manslaughter instruction

 Finally, Appellant argues that the trial court erred in refusing to submit Appellant's requested jury instruction of voluntary manslaughter.

 When a jury is given the option to convict a defendant of first degree and second degree murder, and opts to convict on first degree murder, there is no reasonable basis to contend the jury would have found differently had voluntary manslaughter instructions been submitted. *State v. Winfield*, 5 S.W.3d 505, 513 (Mo. banc 1999).

The judgment is affirmed.

All concur.