

# In the Missouri Court of Appeals
# Eastern District

## DIVISION TWO

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED107404 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of the City of St. Louis |
| vs. | ) | |
| | ) | Honorable Bryan L. Hettenbach |
| HARRY LITTLE, | ) | |
| | ) | |
| Appellant. | ) | FILED: March 31, 2020 |

## Introduction

Harry Little ("Little") appeals from the judgment of the trial court entered after a bench

trial finding him guilty of murder in the second degree, armed criminal action, and unlawful

possession of a firearm. Little raises three points on appeal. In his first two points, Little argues

the trial court clearly erred in denying his motion to suppress statements he made to police and

his motion to suppress various evidence seized without a search warrant or Little's consent. In

his final point, Little challenges the sufficiency of the evidence to sustain his conviction for

unlawful possession of a firearm. Because we find that any error in admitting Little's statements

into evidence was harmless beyond a reasonable doubt, that there was no error in denying the

motion to suppress evidence, and that sufficient evidence was adduced to sustain Little's

conviction for unlawful possession of a firearm, we deny all three points and affirm the judgment

of the trial court.

Factual and Procedural History

On the morning of November 14, 2014, Officers Erich Vonnida ("Officer Vonnida") and Carl Whittaker (collectively, "the Officers") were dispatched to a residence in St. Louis City in response to a call from Little reporting that he had found a woman dead ("Victim") in his backyard. The Officers initially responded to the rear of the residence. Little was standing inside the gated backyard and allowed the Officers entry into the yard. Victim's body was covered by a blanket. Little said that he had covered up Victim's body. Little also told the Officers that he had overdosed the previous evening and could not recall what had happened. The Officers observed that Victim was dead and contacted emergency medical services. The Officers waited with Little in the backyard while waiting for emergency medical services and other officers to respond to the scene.

While the Officers and Little were waiting, Little wanted to go inside because it was cold. Little went into the residence and let the Officers in behind him. The Officers observed a blood stain and a knife on the floor. Little remarked that there must have been a struggle. The Officers had Little sit down, handcuffed him, and then performed a protective sweep of the residence.

Police officers took Little to the police station, placed Little in a chair in an interrogation room, and handcuffed him to the floor. During this time, police officers searched and seized evidence from Little's residence. Approximately two hours later, Detective Amy Funk ("Detective Funk") entered the room, introduced herself to Little, and began asking about the signs of the struggle:

> DET. FUNK: Mr. Little, my name's Amy Funk, I'm a detective here with the homicide division. I'll be investigating this incident, ok? Now, it's my understanding that you, um, whenever the police officers went in and they saw the signs of the struggle you were talking about obviously there was something that had happened in the, in the, in the house, is that correct?

2

LITTLE:         I don't know.

DET. FUNK:   Well, to you did it look like something had gone on right there?

LITTLE:         Well, I mean I seen the knives on the floor, you know.

DET. FUNK:   Ok.  So what I'd like to do is be able to go in and process that stuff, do you understand that, for evidence?  So what I'd like to do is I'd like to have you sign a consent to search.

Little agreed and signed a consent-to-search form.  Detective Funk then read Little his Miranda[1] rights.

Detective Funk next asked Little if he would be willing to submit to a gunshot residue test and a buccal swab:

DET. FUNK:   Now with that being said, there are a couple of things that, that we'd like to do to help further prove that you have no involvement in this, do you understand that?  Now, the first thing that we'd like to do is this.  This is called a GSR test. Ok?  And basically what it does is it takes off little like specks or whatever from your skin and stuff just to prove that there's no gunshot residue on your hands.  Would you be willing to do that?

LITTLE:         I won't do anything without a lawyer [unintelligible].

DET. FUNK:   Ok.  Well, and listen, if that is indeed what you wish to do that's fine, but I want you to know that when this is all said and done, these things are gonna help prove your innocence.

LITTLE:         I understand.  But I just don't want to do anything without a lawyer.

DET. FUNK:   Ok, well here's what, here's what we need to understand at this point.  I need this stuff as evidence, ok?

LITTLE:         Yes, ma'am.

DET. FUNK:   And I need this stuff to prove that you're not involved, ok?  So if I have to go register a search warrant to get this stuff then that's what I'll have to do.  Because one way or the other we're gonna have to do that.

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

3

LITTLE: You gotta do what you gotta do, but I can't do nothing without a lawyer.

DET. FUNK: I understand that, but, do you have a lawyer on file that you wish to speak with?

LITTLE: No ma'am.

DET. FUNK: So what I need from, what I need at this point is for you to understand that in order to go forward with this, in order to prove that you are not involved, this has to be done, and a buccal swab. Those are the only two real things that need to be done, ok? And that just takes saliva out of your mouth and this just takes things off of your hand and then I can get it to the lab and hopefully we can have it back right away and figure out that you have nothing to do with this.

LITTLE: I'm on parole miss.

DET. FUNK: I understand that. But if you did nothing wrong, you did nothing wrong.

LITTLE: Yeah, well just the mere fact that that happened at that residence, has doomed me from the start.

DET. FUNK: No, no sir. Not at all. Not at all.

LITTLE: I don't want to do anything without a lawyer because I done, y'all know my jacket, you know that long ago I don't do anything without a lawyer.

After a little more conversation, Detective Funk left the room.

Approximately ten minutes later, Detective Funk returned and asked Little for information about himself, including his full name, birthdate, social security number, and address. Detective Funk then asked about Victim, including questions about Little and Victim's relationship history. Detective Funk began to ask Little when he had last seen Victim and what he had been doing the prior day:

DET. FUNK: When did you see her last?

LITTLE: Yesterday.

4

DET. FUNK: What time about?

LITTLE: Five something, 5:30 I think. About 5:30 when I left for work.

DET. FUNK: Ok. So do you work evenings?

LITTLE: I work during the day.

DET. FUNK: Ok. So 5:30 in the morning?

LITTLE: No, 5:30 in the evening.

DET. FUNK: So you left the house and she was there? Is that what you're saying? I guess I'm not understanding.

LITTLE: When I came home, was she there? Probably wasn't. But she came while I was there and then I was boogying.

DET. FUNK: Ok, so when did you leave the house?

LITTLE: About 5:30 or somewhere around there.

DET. FUNK: And then you were gone 'til when?

LITTLE: 'Til this morning.

DET. FUNK: Ok. So from 5:30 PM last night until what time this morning about?

LITTLE: Whenever I called the police.

DET. FUNK: Ok. That was like 6:40ish.

LITTLE: I don't know.

DET. FUNK: And so you spent the night someplace else or doing something else? What were you, where were you?

LITTLE: I'm a dope fiend miss, I was passed out.

DET. FUNK: Do you know where you were passed out?

LITTLE: Not really.

DET. FUNK: So . . .

5

LITTLE:	When I woke up, somewhere, I don't know, I need a lawyer, I'm steady talking, saying I was a dope fiend, I was passed out.

Detective Funk then inquired about that morning, Victim's other relationships, and Little's relationship with Victim, before returning to questioning about the previous night.

Detective Funk then asked about Little's physical condition, as she had previously brought him some potato chips in response to him stating he needed to eat:

DET. FUNK:	Is your stomach feeling a little bit better?

LITTLE:	That ain't, that ain't really gonna do it, I need carbohydrates, but I ain't gonna worry about it right now.

DET. FUNK:	I understand, those chips got some carbohydrates in it, but I promise you I'll get you some more food, alright. I'm kind of running around right now getting things together.

LITTLE:	I understand.

DET. FUNK:	Just uh, just bear with me, ok Mr. Little?

LITTLE:	I'm trying to but I'm saying and I've been instructed all my life, don't do no talking without a lawyer, you know. And I used to, I didn't adhere to that before, but I would like to adhere to that this time.

DET. FUNK:	I understand that. I'm not asking you anything guilt-seeking Mr. Little. I'm just trying to get some background information—

LITTLE:	I never should even called them doggone police, I should have just left, you know, I'd known I was gonna get caught, which I did know it, but I couldn't just leave, you know, come home, and leave, you know, the person laying out there in the damn [unintelligible] you know, and don't report it.

Detective Funk questioned Little for about two more minutes before leaving the room.

The State obtained warrants for a gunshot residue test and buccal swab, which were then performed on Little.

6

The State charged Little with murder in the first degree, armed criminal action, tampering with physical evidence, and unlawful possession of a firearm. Little and the State agreed that Little would waive his right to a jury trial and that the State would not seek the death penalty.

Prior to trial, Little filed two motions to suppress, and the trial court held a hearing for both. The first motion sought to suppress statements made by Little to the Officers before he was given his Miranda warnings, statements made by Little to Detective Funk before he was given his Miranda warnings, and statements Little made to Detective Funk after Little was given his Miranda warnings and after Little invoked his right to counsel. The trial court denied the motion, finding that Little did not make a clear, unequivocal invocation of his right to counsel. The trial court also concluded that Little was not prejudiced by his statements, noting Little "did not confess to the murder or make any directly incriminating statements" and "did not incriminate himself."

The second motion sought to suppress evidence obtained from searches and seizures at Little's residence on the morning of November 14, 2014, before Little signed the consent-to-search form. The trial court denied the motion on several grounds, including that the evidence was in plain view, discovered during a protective sweep, and that Little consented to a search of the residence.

The case proceeded to a bench trial. The State called Officer Vonnida, who testified to what he saw and what happened the morning he responded to the scene. The State also called C.M., Little's neighbor at the time of Victim's death. The night before Little called 9-1-1, C.M. was in his bedroom, which had one exterior wall located next to Little's yard. C.M. heard a woman yelling for help, specifically calling for C.M.'s grandfather (who lived with C.M.). The woman's yelling was followed by gunshots. C.M. went to tell his mother, K.H., that he had just

7

heard someone most likely get killed. C.M. called 9-1-1 and reported that he had heard someone get shot. C.M. then looked outside and saw Little going back and forth between his house and his car repeatedly before leaving. C.M. recognized Little in part due to Little's limp.

The State additionally called K.H., who testified that she heard the gunshots at the same time as C.M. and that the gunshots sounded nearby. K.H. also saw Little in his backyard following the gunshots, partially recognizing him because of his gait and the clothes he was wearing. K.H. also saw Little leave the residence in his car.

The State called Dr. Michael Graham ("Dr. Graham"), the chief medical examiner for the City of St. Louis. Dr. Graham was the supervising senior pathologist for Victim's autopsy. Dr. Graham testified that the cause of death was the disruption of Victim's aorta and heart by gunshots fired by someone else.

Another witness for the State was Erik Hall ("Hall"), the biology technical leader at the St. Louis Metropolitan Police Department Crime Laboratory. Hall testified that there were multiple areas in the residence where blood appeared to have been cleaned up, in addition to confirming that various stains in the residence or on evidence that appeared to be blood did, in fact, test consistently with being blood.

Detective Funk testified for the State as to the statements made by Little during the interrogation. Little did not testify.

During the State's rebuttal in closing arguments, the State characterized one of Little's statements made to Detective Funk as a confession:

> And, finally, what does [Little] tell you – what does he tell Detective Funk? That he shouldn't have called the police because he got caught. That's what the culmination was because as the day wore on, as Detective Funk's investigation moved forward, he knew he got caught. That's the last thing he really says on there. I shouldn't have called the police but I got caught. But I couldn't just leave the house, come to the house, and leave the house.

8

The trial court convicted Little of murder in the second degree, armed criminal action, and unlawful possession of a firearm. The trial court found Little not guilty of tampering with physical evidence. The trial court sentenced Little to life in prison for both murder in the second degree and armed criminal action, to be served consecutively. The trial court sentenced Little to fifteen years in prison for unlawful possession of a firearm, to be served consecutively to the sentences for second-degree murder and armed criminal action. This appeal follows.

## Points on Appeal

In Point One, Little argues the trial court clearly erred in denying his motion to suppress the statements Little made to Detective Funk after Little invoked his right to counsel. In Point Two, Little alleges the trial court clearly erred in denying his motion to suppress various pieces of evidence that were seized without a warrant or Little's consent. In Point Three, Little contends the trial court erred in convicting him of unlawful possession of a firearm because there was not sufficient evidence to sustain the conviction.

## Standard of Review

Regarding Points One and Two, we review a denial of a motion to suppress to determine if the denial is supported by substantial evidence, and we will only reverse if the denial was clearly erroneous. State v. Lovelady, 432 S.W.3d 187, 190 (Mo. banc 2014) (internal citation omitted). Clear error is error that leaves us "with a definite and firm belief a mistake was made." State v. Esmerovic, 544 S.W.3d 695, 697 (Mo. App. E.D. 2018) (internal quotation omitted). As to Point One, whether conduct violates the Fifth Amendment is a question of law that we review de novo. State v. Holman, 502 S.W.3d 621, 624 (Mo. banc 2016) (citing State v. Lammers, 479 S.W.3d 624, 630 (Mo. banc 2016)); see also U.S. Const. amend. V.

As to Point Three, "[w]e review the sufficiency of the evidence in a bench trial of a criminal case using the same standard as a jury-tried case." State v. Banks, 511 S.W.3d 463, 465 (Mo. App. E.D. 2017) (internal citation omitted). Therefore, we "must view the evidence in the light most favorable to the judgment, disregarding any contrary evidence and granting the State all reasonable inferences from the evidence." State v. Johnson, 244 S.W.3d 144, 152 (Mo. banc 2008) (internal citation omitted).

Discussion

## I.      Point One—Motion to Suppress Statements

Little alleges the trial court clearly erred in denying his motion to suppress the statements he made to Detective Funk after Little invoked his right to counsel. Specifically, Little focuses on the statement he made to Detective Funk that "I'd known I was gonna get caught."

"Statements made during a custodial interrogation are inadmissible against a suspect on the issue of that suspect's guilt of the charged offense unless police first inform the suspect of his or her rights under the Fifth Amendment." State v. Schneider, 483 S.W.3d 495, 501 (Mo. App. E.D. 2016) (citing State v. Hill, 247 S.W.3d 34, 44 (Mo. App. E.D. 2008) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966))). Custodial interrogation has two components: custody and interrogation. State v. Spears, 452 S.W.3d 185, 194–95 (Mo. App. E.D. 2014).

Whether a suspect is in custody is determined by examining the totality of the circumstances. Schneider, 483 S.W.3d at 501 (internal citation omitted). "An individual is only in custody for purposes of a custodial interrogation if he or she is either formally arrested or is subjected to 'arrest-like restraints.'" Spears, 452 S.W.3d at 195 (quoting State v. Glass, 136 S.W.3d 496, 508–09 (Mo. banc 2004)).

"Interrogation includes express questioning and its functional equivalent; that is, any words or actions the police should know are reasonably likely to elicit an incriminating

10

response." Id. (internal citation omitted). Conversely, requests for consent to search are not an "interrogation" because they do not seek incriminating responses. State v. Holman, 502 S.W.3d at 624 (internal quotation omitted). Similarly, Missouri courts typically find that routine booking questions do not rise to the level of an interrogation. State v. Ream, 223 S.W.3d 874, 876 (Mo. App. S.D. 2007) (internal citations omitted) (noting that a minority of Missouri courts instead find such questions to be interrogation falling within an exception).

Included among the Miranda warnings is the right of the individual being interrogated to the presence of an attorney. State v. Bell, 488 S.W.3d 228, 238 (Mo. App. E.D. 2016) (citing Miranda, 384 U.S. at 479). Once the individual being interrogated invokes their right to counsel, the interrogation must cease. Id. To be valid, the invocation of the right to counsel must be both unambiguous and unequivocal. State v. Starks, 470 S.W.3d 410, 414 (Mo. App. E.D. 2015) (citing Davis v. United States, 512 U.S. 452, 461–62 (1994)). The test is objective in nature, with the question being whether a reasonable police officer in the circumstances would have understood the purported invocation to be a request for an attorney. Id. (internal citation omitted).

However, not every Fifth Amendment violation leads to a new trial. "A properly preserved federal constitutional error in a criminal trial does not require reversal and remand for a new trial if the reviewing court determines the error was harmless beyond a reasonable doubt." State v. Rice, 573 S.W.3d 53, 66–67 (Mo. banc 2019) (internal quotation omitted); Chapman v. California, 386 U.S. 18, 24 (1967). Importantly, the State need not prove the evidence had no possible effect on the trier of fact, as that "would be tantamount to requiring automatic reversal[.]" Id. at 71 (internal quotation omitted).

That Little was in custody when he was questioned is not disputed. Furthermore, the parties do not dispute that Detective Funk began to interrogate Little at some point, and that Little at some point thereafter invoked his right to counsel. The main disagreements between Little and the State focus on when Detective Funk initiated her interrogation, when Little first validly invoked his right to counsel, and the consequence of that invocation.[2]

A.      Little's Invocation of Right to Counsel

We begin our analysis with two statements made by Little which are not directly addressed by the trial court.[3] First, prior to his statement about getting caught, Little told Detective Funk, "When I woke up, somewhere, I don't know, *I need a lawyer, I'm steady talking*, saying I was a dope fiend, I was passed out." Not only did Little unequivocally state that he needed a lawyer, he gave a reason as to why: he kept talking to Detective Funk. See Starks, 470 S.W.3d at 414 (citing Davis, 512 U.S. at 461–62). A reasonable police officer when hearing the statement "I need a lawyer, I'm steady talking," would have understood Little to be invoking his right to counsel. See id.; compare State v. Harris, 305 S.W.3d 482, 480–90 (Mo. App. E.D. 2010) (per curiam) (holding statements from the interrogee that they "would rather appoint a lawyer" than talk to law enforcement were unequivocal invocations) with State v. Lampkins, 430 S.W.3d 929, 931 (Mo. App. S.D. 2014) (holding questions from the interrogee about whether they needed an attorney was not an unequivocal invocation of the right to counsel). Notably, the State does not directly address this part of Little's statement in its brief.

---

[2] The State does argue that interrogation had not yet begun at the time Detective Funk was seeking permission to conduct a gunshot residue test and buccal swab, arguing further that any alleged invocations by Little at that point were invalid as anticipatory.

[3] The trial court only directly addressed Little's alleged invocations made in response to requests for gunshot residue and buccal swab testing when Little stated that he "didn't want to do nothing" without a lawyer. The trial court stated, "Although he repeated this at least two more times while being questioned, at no time did he make a clear, unequivocal invocation of his right to a lawyer." Therefore, it is not clear from the record to what degree the trial court considered the invocations we address here.

12

Rather, the State's brief edits out the portion of the transcript where Little says he was "steady talking," claiming this phrase was unintelligible. We acknowledge that Little is indeed unintelligible at times during his interrogation with Detective Funk. However, the words "I'm steady talking" are easily understood, and thus pertinent to our analysis.

The State counters that even if Little validly invoked his right to counsel, the invocation did not bar further interrogation by Detective Funk because Little later voluntarily initiated further discussion. "A request for counsel bars further interrogation until an attorney is present, unless the accused *in the interim* voluntarily initiates discussion." See State v. Bannister, 680 S.W.2d 141, 147–48 (Mo. banc 1984) (citing Edwards v. Arizona, 451 U.S. 477, 484–85 (1981)) (emphasis added). The State's argument is unavailing because the record clearly shows that Little could not possibly have reinitiated the discussion during any interim because the interrogation never ceased. See id. There was no interim. Accordingly, Little's validly invoked right to counsel was violated by Detective Funk when she did not cease her interrogation. See Bell, 488 S.W.3d at 238 (citing Miranda, 384 U.S. at 474, 479).

Moreover, even assuming *arguendo* that Little's initial attempt to invoke his right to counsel was not valid, Little repeatedly invoked his right to counsel before making his statement about "getting caught":

LITTLE:     I'm trying to but I'm saying and I've been instructed all my life, don't do no talking without a lawyer, you know. And I used to, I didn't adhere to that before, but I would like to adhere to that this time.

DET. FUNK:     I understand that. I'm not asking you anything guilt-seeking Mr. Little. I'm just trying to get some background information—

LITTLE:     I never should even called them doggone police, I should have just left, you know, I'd known I was gonna get caught, which I did know it, but I couldn't just leave, you know, come home, and

13

> leave, you know, the person laying out there in the damn [unintelligible] you know, and don't report it.

Little's statement, "don't do no talking without a lawyer . . . . I would like to adhere to that this time," could not have been more clear. His request not to speak to Detective Funk without an attorney was sufficiently unambiguous that any reasonable police officer would have understood Little's statement to be an invocation of the right to an attorney. See Starks, 470 S.W.3d at 414 (citing Davis, 512 U.S. at 461–62). While the State again argues that Little reinitiated the conversation, we reject this argument for the same reasons as above.[4] See Bannister, 680 S.W.2d at 147–48 (citing Edwards, 451 U.S. at 484–85).

Detective Funk's conduct in this case is troubling and undermined the constitutional protections guaranteed to Little.[5] However, after a careful review of the record, we are persuaded that any violation of Little's Fifth Amendment rights by Detective Funk did not cause Little prejudice at his bench trial.

Generally, we presume that a trial court does not give weight to erroneously admitted evidence in a bench trial "unless the trial court relied on the inadmissible evidence in making its findings." State v. Hein, 553 S.W.3d 893, 898 (Mo. App. E.D. 2018) (citing State v. Sladek, 835 S.W.2d 308, 313 (Mo. banc 1992); Worthington v. State, 166 S.W.3d 566, 573 (Mo. banc 2005)). We note that the trial court here affirmatively found that Little "did not confess to the

---

[4] At oral argument, the State advanced the alternative argument that Little interrupted Detective Funk shortly after he made his statement about getting caught, essentially preventing Detective Funk from honoring his invocation. We disagree. First, Little clearly stops speaking after invoking, giving Detective Funk a chance to respond. Second, Detective Funk's response prior to being interrupted indicated that she was not going to honor his invocation. Detective Funk not only failed to inform Little that she was going to cease questioning him. Instead, Detective Funk stated that she was only seeking background information and not anything guilt-seeking, strongly suggesting she was going to continue questioning Little despite his invocation.

[5] While not relevant to our analysis, we also note that even when Detective Funk did ultimately respect Little's invocation of his right to counsel, she first disregarded it. After Little told Detective Funk, "talk with a lawyer," she did not cease the interrogation until after she said, "[T]his is your opportunity to give us your side of the story." Clearly Detective Funk understood Little to be invoking at that point, and, despite that, engaged in a blatant attempt to convince Little to keep speaking despite having invoked his right to counsel.

14

murder or make any directly incriminating statements" and "did not incriminate himself." We must accordingly presume that the trial court, as the trier of fact, did not give weight to any statements that could have been viewed as incriminating and did not rely upon that statement in making its findings. See id. The trial court expressly rejected the State's characterization in closing argument that Little's statement about getting caught was tantamount to a confession.[6] Further, neither Little nor Detective Funk treated Little's statement as a confession at the time Little made the statement, and the record does not suggest that Detective Funk acted as if Little had just confessed after making the statement. Rather, the record reasonably suggests that Little was acknowledging that he knew he would be viewed by others as a suspect.

Second, any alleged prejudice from this one statement is substantially overshadowed by the overall strength of the State's case against Little. Critically, C.M. and K.H. both testified that they saw Little at the scene of the crime shortly after hearing gunshots. C.M. and K.H. were neighbors who explained specifically why they were confident in their identification of Little— both of them recognizing Little's gait and K.H. recognizing his clothing. Their eyewitness testimony was extremely credible. The significance of their testimony is compounded by the fact that Little could not account for his location at the time of the killing and the lack of any significant evidence that a third person may have been present.[7] Additionally, the record presented evidence of both a struggle and an attempted cleaning of the blood residue in the residence, making it more likely that the killer was someone who had easy access to the residence, namely, Little.

---

[6] Had this case been tried to a jury, we could not determine what significance, if any, jurors may have given to Little's statement about "getting caught" which would have demonstrably complicated our analysis of prejudice.
[7] Little told the Officers that he could not account for his location at the time of the killing shortly after they arrived at his residence, well before any Miranda violations.

Because we must presume the trial court did not rely upon the allegedly incriminating statements made by Little when rendering its judgment, and because the State's case even without the statement at issue was very strong, we hold that the trial court's error in not suppressing Little's statement about "getting caught" was harmless beyond a reasonable doubt. See Rice, 573 S.W.3d at 66–67; Chapman, 386 U.S. at 24. Accordingly, on prejudice grounds alone, we affirm the trial court's judgment. See Rice, 573 S.W.3d at 66–67; Chapman, 386 U.S. at 24. Point One is denied.

## II.    Point Two—Motion to Suppress Evidence

In Point Two, Little alleges that the trial court clearly erred in denying his motion to suppress various evidence—specifically knives, rags, blood evidence, latent prints, scene photographs, and cell phone records—because the evidence was seized absent Little's consent or a search warrant.

The Fourth Amendment to the United States Constitution and Article I, section 15 of the Missouri Constitution provide equal guarantees against unreasonable searches and seizures. State v. Oliver, 293 S.W.3d 437, 442 (Mo. banc 2009); see also U.S. Const. amend. IV; Mo. Const. art. I, sec. 15. "As a general rule, warrantless searches and seizures inside a home are presumptively unreasonable and unconstitutional." Id. (citing State v. Rutter, 93 S.W.3d 714, 723 (Mo. banc 2002)). Evidence that is derivative of a Fourth Amendment violation must generally be excluded. See id. (citing State v. Miller, 894 S.W.2d 649, 654 (Mo. banc 1995)).

One exception to the general rule of exclusion is the inevitable-discovery doctrine. Id. at 443 (citing Rutter, 93 S.W.3d at 726). Under the inevitable-discovery doctrine, evidence discovered through unconstitutional means is nevertheless admissible where the evidence would have been inevitably discovered by law enforcement. Id. (citing Rutter, 93 S.W.3d at 726). For the inevitable-discovery doctrine to apply, the State must show by a preponderance of the

evidence that proper law enforcement procedures would have been utilized and those procedures would in fact have inevitably led to the discovery of the challenged evidence. Id. (citing Rutter, 93 S.W.3d at 726 (citing Nix v. Williams, 457 U.S. 431, 444 (1984))).

Here, even if the challenged evidence was the result of an unreasonable, unconstitutional search, such evidence would nevertheless be admissible under the inevitable-discovery doctrine. Id. (citing Rutter, 93 S.W.3d at 726). The core of Little's argument is that he did not consent to the searches because they were conducted before he signed the consent-to-search form. However, the fact that Detective Funk later obtained Little's consent demonstrates by more than a preponderance of the evidence that proper law enforcement procedures would have been utilized and those procedures would in fact have inevitably led to the discovery of the challenged evidence. Id. (citing Rutter, 93 S.W.3d at 726 (citing Nix, 457 U.S. at 444)). Moreover, "[n]o question exists but that a search warrant would properly issue to a search of the house in which a killing had occurred." State v. Butler, 676 S.W.2d 809, 813 (Mo. banc 1984).[8]

Because the inevitable-discovery doctrine applied, the challenged evidence was properly admissible. See Oliver, 293 S.W.3d at 442 (citing Rutter, 93 S.W.3d at 726). Accordingly, the trial court did not clearly err in denying Little's motion to suppress. See Lovelady, 432 S.W.3d at 190. Point Two is denied.

## III.    Point Three—Sufficiency of the Evidence

In Point Three, Little alleges that the trial court erred in convicting him of unlawful possession of a firearm because there was insufficient evidence to convict him beyond a reasonable doubt. Little correctly acknowledges that possession can be proven through

---

[8] Little acknowledges that a warrant was obtained for the cell phone records, but argues that the warrant was only obtained due to the unconstitutional search of Little's residence and thus the records must be excluded as fruit of the poisonous tree. Since we hold that the evidence obtained through the search was admissible, the cell phone records were not the fruit of the poisonous tree and are also admissible under the inevitable-discovery doctrine.

circumstantial evidence. See, e.g., State v. Hutchison, 957 S.W.2d 757, 767 (Mo. banc 1997) (internal citation omitted) ("Circumstantial evidence is afforded the same weight as direct evidence."); State v. Middlemist, 319 S.W.3d 531, 537 (Mo. App. S.D. 2010) (citing State v. Grim, 854 S.W.2d 403, 406–08 (Mo. banc 1993)) ("A verdict is not flawed because it was based on circumstantial evidence or because that circumstantial evidence failed to exclude every reasonable theory of innocence."). Additionally, Little does not dispute that Victim's cause of death was gunshots that disrupted Victim's aorta or that the evidence was sufficient to convict him of murder in the second degree. However, Little argues that, unlike the present case, all cases upholding a conviction for possession of a firearm in Missouri featured either a recovered firearm or a witness testifying that the convicted possessed a firearm. Therefore, Little argues that there is not sufficient evidence to uphold his conviction.

We disagree. Even accepting for the sake of argument that no Missouri case has previously upheld a conviction of possession of a firearm against a sufficiency of the evidence challenge absent recovery of a firearm or witness testimony, the question before us is whether the evidence, when viewed in the light most favorable to the judgment, including granting the State all reasonable inferences, supports the conviction. See Johnson, 244 S.W.3d at 152. Here, the unchallenged conclusion is that Victim was shot to death. Likewise, Little does not challenge the sufficiency of the evidence of his conviction for murder in the second degree. Accepting both that Victim was shot to death and that Little was the person who shot Victim to death, *the only reasonable inference* is that Little possessed a firearm. See id.

Because the evidence, when viewed in the light most favorable to the judgment, supported Little's conviction for possession of a firearm, the trial court did not err. See id. Accordingly, we affirm the judgment of the trial court. See id. Point Three is denied.

18

## Conclusion

The judgment of the trial court is affirmed.

KURT S. ODENWALD, Judge

Philip M. Hess, P.J., concurs.
Lisa P. Page, J., concurs.

19