STATE of Missouri, Plaintiff–
Respondent,

v.

Vicki L. MIDDLEMIST, Defendant–
Appellant.

No. SD 29803.

Missouri Court of Appeals,
Southern District,
Division One.

Aug. 31, 2010.

Alexa I. Pearson, Columbia, MO, for Appellant.

Chris Koster, Attorney General, and Evan J. Buchheim, Assistant Attorney General, Jefferson City, MO, for Respondent.

DON E. BURRELL, Judge.

■ Vicki Middlemist ("Defendant") was convicted following a jury trial of stealing more than $25,000, a violation of section 570.030.[1] Defendant now timely appeals her conviction in five points relied on that allege: 1) her conviction was not supported by sufficient evidence; 2) the trial court plainly erred when it delivered to the deliberating jury a document that had not been received into evidence; 3) the trial court plainly erred when it informed the parties about the contents of a written note a juror had given the court's bailiff; 4) the trial court abused its discretion when it denied Defendant's pre-trial motion seeking to compel the State to produce certain bank statements and software records; and 5) the trial court abused its discretion when it admitted evidence of a garnishment and two electronic bank transfers.[2] Finding no merit in any of Defendant's claims, we affirm.

### Sufficient evidence supported Defendant's conviction.

■ "A person commits the crime of stealing if he or she appropriates property or services of another with the purpose to deprive him or her thereof, either without his or her consent or by means of deceit or coercion." Section 570.030.1. The offense is a "B felony if the value of the property or services equals or exceeds twenty-five

thousand dollars." Section 570.030.7. Proof of the offense may be based upon circumstantial evidence. *See State v. Grim,* 854 S.W.2d 403, 405–06 (Mo. banc 1993).

In reviewing a challenge to the sufficiency of the evidence we "must determine whether there is sufficient evidence from which a reasonable juror could have found the defendant guilty beyond a reasonable doubt." *State v. Whalen,* 49 S.W.3d 181, 184 (Mo. banc 2001). In so doing, we view the evidence adduced at trial in the light most favorable to the jury's verdict and give the State the benefit of all reasonable inferences that may be drawn from that evidence. *Id.*; *State v. Langdon,* 110 S.W.3d 807, 811 (Mo. banc 2003). Any evidence or inference contrary to the verdict is disregarded. *State v. Belton,* 153 S.W.3d 307, 309 (Mo. banc 2005). The following summary of the evidence is in accord with these governing principles.

Defendant worked for JLD Tech Services which operated a business in Buffalo known as PIP Internet Service ("PIP"). PIP provided internet service to customers and also sold computer parts and equipment. Defendant was hired on October 10, 2005, by Raymond Keeling, PIP's operations manager, to replace Jewell Smith, who was retiring from her full-time position with the business. Keeling was looking for someone "to strengthen our accounting processes and controls, internal management. Things like cash and inventory." Defendant's resume indicated that she had a bachelor's degree in business administration. Keeling also believed that

---

1. All references to section 570.030 are to RSMo Cum.Supp.2006.

2. Because Defendant's fifth point includes more than one claim of error, it is multifarious and fails to comply with Rule 84.04 (as made applicable by Rule 30.06(c)). *State v. Garrison,* 276 S.W.3d 372, 378 n. 4 (Mo.App.

S.D.2009). Because the State has not objected to the multifarious nature of the point and we can discern the nature of Defendant's complaints, we choose to exercise our discretion to review point five on the merits. *See Dixon v. Thompson,* 235 S.W.3d 568, 571 (Mo.App. S.D.2007).

Defendant had "used QuickBooks Pro, done invoicing and accounts receivable and accounts payable." Defendant worked at PIP from October 10, 2005, through June 23, 2007.

Smith stayed on at PIP long enough to train Defendant and then worked with her again on a couple of occasions when Smith came back to fill in. Smith said it was originally supposed to take her four days to train Defendant, but she "only worked with [Defendant] three, she caught on very quickly." Smith trained Defendant to write out receipts for customers when they made payments, enter those payments into PIP's billing program, then physically mark the receipts with a "check" when the information they contained had been entered into the billing program.

The receipts given to customers came from books of receipts that were pre-numbered and "self-carboning," thus leaving a copy for PIP when the receipt the customer received was created. The receipts showed the customer's name, the amount paid, whether the payment was made by cash or check (as some customers using checks also requested receipts), and the signature of the employee who had prepared the receipt.

The business kept cash on hand to make change, reimburse employees for gas purchases (before the business switched to a fuel card), make incidental purchases, provide customers with refunds, and cash checks for employees. PIP began using a fuel card after Defendant suggested doing so would allow her not to have to pay the "fuel tickets" from PIP's cash drawer. In regard to the business's cash drawer, Smith told Defendant "that the money was [Defendant's] responsibility, and that nobody else was to get into the money." Defendant's duties also included preparing the business's bank deposits and tracking the forms used for expense reimburse-ments. Keeling would typically take the deposits to the bank, but Defendant would occasionally do so.

Defendant was at her desk most of the time, but other employees would occasionally accept cash payments from customers and issue them receipts if Defendant was not available. Keeling testified that, "To one degree or another any employee might have access to the cash drawer on any given day." But if another PIP employee had received a payment from a customer, that employee would deliver the funds and receipt book to Defendant or place them on her desk. If a receipt was issued to a customer but not entered into the billing program, the customer's account would not be credited, the charge would continue to bill, and the customer would eventually complain about receiving an additional bill or having his internet service interrupted for the alleged non-payment of an amount he had already paid.

In June 2007, Keeling began to suspect that something untoward was happening with the business's cash after there was not enough cash in the cash drawer on a few occasions to refund money to customers or to purchase something that an employee needed. Keeling began looking at "how much cash was actually coming in the door, versus total receipts." He concluded "that there was a lot more cash that came in the door, than that [sic] went to the bank" and that it had been going on "pretty much" during the period of time that Defendant had worked at PIP. During the course of her employment, Defendant never told Keeling that any money was missing from the cash drawer.

Part of Keeling's investigation included comparing the total amount of cash received for internet services as recorded in the computer billing system with the cash shown as deposited on PIP's bank statements. Keeling also consulted PIP's ac-

countants and investigated his own records in preparing a summary of the information he had collected.

Dallas County Sheriff Deputy Kyle Heidler investigated the matter and interviewed Defendant. Deputy Heidler testified that Defendant told him she was in charge of bookkeeping, receiving payments, and preparing the deposits. According to Deputy Heidler, Defendant told him that "very little" cash came through the business.[3]

At trial, Keeling testified about particular instances when the records he had reviewed reflected that cash had been received but not deposited. Keeling testified that he then verified that the cash had not been deposited into any other bank accounts associated with PIP. Keeling testified that he believed approximately $28,000 in cash was missing and that he had prepared a document that summarized over the course of Defendant's employment at PIP the receipts Defendant had issued for cash payments from customers, the company's petty cash disbursements, and the cash actually deposited into the bank. This summary was received into evidence as Exhibit 18. Exhibit 18 revealed that during the time period Defendant had worked for PIP: 1) Defendant had issued receipts for cash totaling $35,936.63; 2) $6,168.00 had been disbursed from petty cash; and 3) only $2,119.03 in cash had actually been deposited with the bank. Based on Exhibit 18, the jury could reasonably infer that $27,649.60 in cash that should have been deposited never made it to the bank.

Defendant's own expert witness, Stan Schmidt, a certified public account, concluded that "[b]ased on the records that were provided, . . . you could sort of track the track [sic] the cash from receipt to the bank. Or whether or not it made it to the bank." He also conceded that "quite a bit of cash came into the building." Schmidt concluded that "[b]ased on the records that [he] was provided it appeared that not all of the cash made it to the bank."

Another exhibit, Exhibit 19, was a summary Keeling had prepared which covered cash received for computer parts and other non-internet-service purchases recorded on different receipts and included cash payments receipted by PIP employees other than Defendant. Exhibit 19 was also received into evidence. Exhibit 19 showed that at the end of September 2005, before Defendant began working for PIP, actual cash deposits were $207.18 less than the total cash available for deposit. In contrast, by June 23, 2007—Defendant's last day at PIP—Exhibit 19 showed that actual cash deposits were $48,052.39 less than the total cash which should have been available for deposit. Based on Exhibits 18 and 19, and the testimony recited above, the jury could reasonably infer that the cash that should have been deposited into PIP's bank account was stolen by Defendant. It could also infer that Defendant urged PIP to switch to a fuel card so that a larger pool of PIP's cash would be available to her on a more consistent basis.

Defendant did not contest the admissibility of any of the above-recited evidence. Instead, Defendant simply argues that other PIP employees had access to the cash drawer, that PIP did not use good accounting practices, that the received exhibits contained inaccuracies, and that the State's evidence varied as to the actual amount of cash stolen. While these were appropriate

---

**3.** Other evidence adduced from Deputy Heidler will be discussed below in our analysis of Defendant's third point.

arguments to make to the jury, they provide Defendant with no help on appeal.

■ A verdict is not flawed because it was based on circumstantial evidence or because that circumstantial evidence failed to exclude every reasonable theory of innocence. *Grim,* 854 S.W.2d at 406–08. An inference from the facts contrary to the verdict is not considered unless it "necessarily give[s] rise to a reasonable doubt in a reasonable juror's mind." *Id.* at 413. The issue is not whether someone else could have stolen the money, but whether the jury could have found the essential elements of the charged offense beyond a reasonable doubt based upon the evidence presented and the reasonable inferences drawn from it. *State v. Chaney,* 967 S.W.2d 47, 52 (Mo. banc 1998) (citing *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

Defendant was in charge of PIP's cash. Keeling and other PIP employees testified that it was Defendant's responsibility to accept payments from customers, issue receipts, then post the payments received and prepare the bank deposits. Defendant admitted that she was in charge of bookkeeping, receiving payments, and preparing deposits. When other employees accepted cash, they gave the cash and receipt book back to Defendant. Because a customer who had his internet access shut off or continued to be billed for an amount he had already paid could be expected to complain about it, a reasonable inference is that customer payments (including cash payments) were recorded. And while the estimates of the total amount of cash stolen varied as the matter was being investigated and tried, the evidence of the most conservative loss figure of $27,649.60 presented at trial via Exhibit 18 exceeded the $25,000 minimum required by section 570.030.7.

Defendant, who was in the best position to know, never told Keeling that any cash was missing. Defendant recommended that PIP begin using a fuel card so that more cash would consistently be on-hand. A reasonable juror could conclude from the evidence received at trial that at least $27,649.60 of PIP's cash did not get deposited into PIP's bank account because Defendant had stolen it. Therefore, Defendant's conviction was supported by sufficient evidence. Point I is denied.

*Defendant failed to show that a document not received in evidence was actually sent to the jury.*

■ During Keeling's testimony, Defendant's counsel stipulated to the admission into evidence of PIP's receipt books and bank statements, respectively marked as Exhibit 14 and Exhibit 15. The bank statements were in a binder Keeling retrieved from his briefcase. Defendant's second point alleges the trial court committed plain error when it later sent Exhibit 15 (the bank statements) to the jury because she assumes that at the time Exhibit 15 was delivered to the jury it also contained, in the back pocket of the binder, a typewritten police report authored by Deputy Heidler that had not been admitted into evidence. This assumption is based on something that occurred well after trial when Defendant's appellate counsel was preparing the record on appeal.

When the prosecutor sent the trial exhibits to Defendant's appellate counsel, Deputy Heidler's typewritten report was inside the back pocket of Exhibit 15. Defendant's appellate counsel noted that his office did not conduct "a detailed inspection of the exhibits when they were received from the prosecutor, ... [and] counsel currently has no information suggesting that the deputy's report was *not* in

the binder when it was received from the prosecutor's office." (Emphasis added).

The State does not dispute the fact that Deputy Heidler's police report was not received into evidence and referred to "arguably inadmissible evidence regarding Defendant's previous convictions and her taking a polygraph test."

■ "Rule 30.20 [ [4] ] provides in relevant part that we may, in our discretion, consider plain errors affecting substantial rights when we find that manifest injustice or a miscarriage of justice has occurred. Plain errors are evident, obvious, and clear." *State v. Williams,* 306 S.W.3d 183, 185 (Mo.App. E.D.2010) (citing *State v. Morris,* 285 S.W.3d 407, 413 (Mo.App. E.D.2009)). Defendant bears the burden of proving that plain error actually occurred. *State v. Lemons,* 294 S.W.3d 65, 71 (Mo.App. S.D. 2009). We believe that Defendant's statement that she has no information suggesting that the police report was *not* inside Exhibit 15 when it was delivered to the jury attempts to stand that burden of proof on its head.

The record does not indicate that Deputy Heidler's statement was included with Exhibit 15 when it was provided to the jury during its deliberations. Exhibit 15 was handed by Keeling to the prosecutor during trial. Defense counsel stated that he had no objection to admission of the exhibit. During his closing argument, Defendant's counsel stated, "Ladies and gentlemen, you'll have an opportunity, if you want to, to look through that white binder [Exhibit 15], at all of those [PIP] bank statements and I certainly would urge you to do so." When the deliberating jury sent the trial court a note asking for all of the exhibits, the following exchange took place in defense counsel's presence:

[THE COURT]: Let's take a look at the evidence.

. . . .

[prosecutor]: It's all there, I think.

THE COURT: Go through it again, and make sure.

[prosecutor]: Well, we did.

THE COURT: I understand, do it one more time. I want you to make sure.

(WHEREUPON, the attorneys collected all of the applicable exhibits)

The court's final day of trial docket entry then states, "All exhibits withdrawn by respective counsel."

Of course the possibility that Deputy Heidler's police report had been included in Exhibit 15 when it was given to the jury was not called to the attention of the trial court because its association with Exhibit 15 was not observed until many months later. It is unknown whether Keeling ever had the deputy's report or whether the deputy had ever had possession of Exhibit 15 before it was submitted to the jury. Defendant has not presented us with any evidence that the jury ever saw, let alone relied on, Deputy Heidler's police report in reaching its verdict. We fail to see how a trial court could commit plain error by failing to address a matter it had no knowledge of and which has not been shown to have actually occurred.

■ "In order to be entitled to relief under the plain error rule, '[a] defendant must not only show prejudicial error occurred, but must also show that the error so substantially affected the defendant's rights that a manifest injustice or a miscarriage of justice would inexorably result if the error were to be left uncorrected.'" *State v. Miller,* 139 S.W.3d 632, 634 (Mo. App. S.D.2004) (quoting *State v. Deckard,*

---

4. All rule references are to Missouri Court Rules (2010).

18 S.W.3d 495, 497 (Mo.App. S.D.2000)). No such showing has been made here. Point two is denied.

### Defendant affirmatively waived any complaint about the juror's note.

■ During the second day of trial, the trial court notified all counsel that one of the jurors had given a note to the bailiff and addressed the matter as follows:

THE COURT: All right, we're out of the hearing of the jury, we have had a juror hand a note to the bailiff. I am going to read the note. We'll see what it is. "Dollar amounts of checks employees cashed out of the drawer. Anyone make a habit of large checks?" Those are swell questions, but jurors don't get to ask questions, for obvious reasons. I'm going to respond.

[defense counsel]: As only you can.

THE COURT: Right. Let me go and get my instructions.

. . . .

THE COURT: Okay. Counsel, my response that I would propose is as follows: You will recall the evidence as presented to you. I am unable to give you additional information. Any objection to that response?

[prosecutor]: No, your Honor.

[defense counsel]: No, your Honor.

Defendant alleges the trial court plainly erred in denying her motion for new trial in that the juror had acted improperly by sending this note because the court had previously instructed the jurors not to discuss the case with anyone and not to share their notes. Defendant asserts she was prejudiced by this error when the State then recalled Keeling to the witness stand and he testified that the employee checks that were written to PIP for cash were "reduced from the alleged amount of missing cash;" that those checks were "[f]actored out" of the total amount of missing cash; that the individual amounts of the checks for cash were small, "[n]othing really large enough to cause an alarm[;]" and "the total of the list of checks was probably less than 2,000 dollars from the entire time period from the combination of the total employees."

Defendant waived this alleged error for purposes of even plain error review when her counsel affirmatively stated, "No, your Honor" in response to the trial court's question about whether counsel had any objection to its proposed method of handling the matter. *State v. Goudeau*, 85 S.W.3d 126, 128–29 (Mo.App. S.D.2002). Defendant also voiced no objection when Keeling was recalled and testified about the matters the juror had referred to in his or her note. Point three is denied.

### Documents sought from State not shown to be in its possession

■ A defendant is entitled to evidence in the State's possession that is: (1) favorable to the defendant; and (2) material to either guilt or punishment. *State v. Artis*, 215 S.W.3d 327, 338 (Mo.App. S.D.2007); Rules 25.03(A)(9) and 25.04(A). "[A] defendant is not entitled to information on the mere possibility that it might be helpful, but must make some plausible showing how the information would have been material and favorable." *State v. Goodwin*, 65 S.W.3d 17, 21 (Mo.App. S.D.2001) (internal quotations omitted).

■ Although the trial court granted certain portions of Defendant's pre-trial motion to compel discovery, it denied Defendant's request that the court compel the prosecutor to produce bank statements for companies associated with PIP for the years 2002 through 2007, documentation from BillMax (PIP's computer billing system) for income and receipts for the years

2002 through 2007, and documentation from Quick Books (PIP's computer accounting software) for income and expenses for the years 2002 through 2007. Defendant's fourth point alleges the trial court abused its discretion when it refused to order the State to produce those documents.

When a trial court is alleged to have abused its discretion in denying a discovery request, we review whether the trial court's action resulted in fundamental unfairness to the accused. *State v. Scott,* 926 S.W.2d 864, 871 (Mo.App. S.D.1996). " 'Fundamental unfairness is determined by whether discovery of the evidence would have affected the outcome of the trial.' " *State v. Deason,* 240 S.W.3d 767, 774 (Mo.App. S.D.2007) (quoting *State v. Merrick,* 677 S.W.2d 339, 343 (Mo.App. E.D.1984)).

We first note that Defendant is only speculating about whether the records she sought would have been helpful. Defendant's assertion is that without a "complete" financial picture of PIP, she was "unable to present theories to counter the State's allegations that she stole money, or to counter the alleged value of the money claimed to be missing." This falls well short of showing the trial court that the documents would have been both material and helpful.

But the more fundamental flaw in Defendant's claim of error is that she has not shown that the State possessed the records she sought. "If Defendant knew of the existence of records that were not provided through discovery and were not in the State's possession, [s]he could have subpoenaed those records but failed to do so." *Artis,* 215 S.W.3d at 339 (citing Rule

26.02(b)). Without a showing that the State had these records and refused to produce them, Defendant cannot demonstrate that it was fundamentally unfair for the trial court to deny her motion to compel their production. Point four is denied.

### *The garnishment was admissible to show motive.*

In April 2007, Defendant observed PIP employee Tyler Lane sign a receipt for a wage garnishment that a "Court Deputy" said needed to be delivered to Keeling. After Lane put the garnishment on Keeling's desk, Defendant went into Keeling's office and removed it, later telling Deputy Heidler that she took the garnishment from Keeling's office because her attorney needed it. A copy of the garnishment was admitted into evidence as Exhibit 13 over Defendant's objection. The garnishment was based on a $2,286.95 judgment from the Circuit Court of Laclede County, Missouri where the garnishor was a "John S. Hood" and the garnishee was "Vicki Middlemist (Iseman)."

A trial court has broad discretion in admitting evidence. *State v. Forrest,* 183 S.W.3d 218, 223 (Mo. banc 2006). Whether the trial court erred in admitting evidence is reviewed for an abuse of that broad discretion. *Id.* We will reverse only if the trial court's ruling "was so prejudicial that it deprived the defendant of a fair trial." *Id.* at 223–24 (quoting *State v. Middleton,* 995 S.W.2d 443, 452 (Mo. banc 1999)). Defendant alleges the trial court committed such an abuse of its discretion by admitting evidence of the garnishment because it was evidence of an inadmissible "uncharged crime[ ] or bad act[ ]." [5]

---

5. The State disputes the classification of this evidence as uncharged crimes or misconduct. Defendant replied by noting the following argument by the State in its closing that characterized Defendant's actions regarding the gar-

 The general rule is that evidence of other crimes cannot be used to show that the defendant has a propensity to commit crime. *State v. Taylor*, 166 S.W.3d 599, 605 (Mo.App. S.D.2005) (citing *State v. Burns*, 978 S.W.2d 759, 761 (Mo. banc 1998)). In order to invoke the rule against the use of other crimes evidence, Defendant must show that the testimony was evidence of uncharged misconduct. *See State v. Destefano*, 211 S.W.3d 173, 179 (Mo.App. S.D.2007).

 Even if we were to assume that the evidence about the garnishment was evidence of a prior uncharged criminal act, Defendant cannot prevail.[6] "When evidence of a defendant's prior criminal act is both logically relevant (has a tendency to directly establish defendant's guilt on the crime currently charged) and legally relevant (its probative value outweighs its prejudicial effect), it is admissible." *State v. White*, 291 S.W.3d 354, 357 (Mo.App. S.D.2009) (citing *State v. Nichols*, 207 S.W.3d 215, 227 (Mo.App. S.D.2006)). "The balancing of the effect and value of evidence rests within the sound discretion of the trial court." *State v. Bernard*, 849 S.W.2d 10, 13 (Mo. banc 1993).

 Exceptions to the general rule against admitting evidence of prior uncharged crimes include situations in which they are relevant to show motive. *State v. Vorhees*, 248 S.W.3d 585, 588 (Mo. banc 2008). Here, the logical relevance of the garnishment was to show motive. Evidence that Defendant had an unpaid debt that had reached the point of garnishment was probative of whether Defendant had a motive to steal money. The additional reasonable inference favorable to the State was that Defendant hid the existence of that debt from her boss to prevent arousing any suspicion by him that she was having financial difficulties—a suspicion that might cause her to lose her unfettered access to PIP's cash.

The trial court was in the best position to weigh the risk of undue prejudice against the probative value of the evidence. *Bernard*, 849 S.W.2d at 13. Any risk of undue prejudice was slight. Having your wages garnished based on a civil judgment is not a crime. And it is doubtful that even Defendant's attempt to hide it from her boss would be seen by a reasonable juror as evidence of a propensity to commit a criminal offense. Appellant does not argue that specific details of the underlying debt were disclosed to the jury, and the jury heard Defendant's explanation for taking the garnishment from Keeling's desk. Because the garnishment evidence was both logically and legally relevant, the trial court did not err in receiving it.

*Defendant waived any objection to evidence of the electronic bank transfers.*

 Deputy Heidler had subpoenaed Defendant's bank records, and he asked

---

nishment and electronic bank transfers as "not right":

> Now, the garnishment and the money transfer. I'm not going to belabor this point, you heard the evidence. It just shows the way that she operated in that office. A garnishment on her wages, then you go in and take it off the desk. That's not right. You know, that's not right. You know that you would never transfer money from your employers account to yourself under any circumstances. Even if you felt like you

had a right to do it, you would go to the boss and say, hey I really think you guys owe me this money. You don't just do it in stealth. But, this whole operation was stealth and there was just a lot of disregard for what was the right thing to do throughout.

6. The State argues that Defendant waived this objection. Because the evidence about which Defendant complains was admissible, we do not need to decide the waiver issue.

Defendant about two electronic bank transfers of $237.00 each that had transferred money from PIP's bank account into Defendant's personal account. Defendant told Deputy Heidler that each transfer equaled the cost of one year's internet service from PIP. Defendant told Deputy Heidler that she had personally paid for one year's internet service for a woman who could not afford to pay. Deputy Heidler said Defendant told him that when the woman did not pay her back, Defendant "repaid herself by debiting her card, and it ended up being twice. And at one point [ ] she said that was on her."

 While Defendant asserts that the trial court's admission of evidence relating to Defendant's electronic bank transfers also violated the "prior bad acts" rule, the State's assertion that Defendant did not preserve the issue for our review is well-taken.

> Preservation of evidentiary questions for appeal requires an objection at the time the evidence is sought to be introduced along with the same objection being carried forward on appeal. *Rogers v. B.G. Transit Corp.*, 949 S.W.2d 151, 153 (Mo. App.1997). An objection to the admissibility of evidence must be specific. *Carter v. St. John's Reg'l Ctr.*, 88 S.W.3d 1, 19 (Mo.App.2002). The purpose of this rule is to ensure that the trial court is informed of the reasons of the objection so that it can thereby make a reasoned and informed ruling. *Id.* Any grounds that are not raised in the objection are considered waived, and a party is prevented from raising such grounds for the first time on appeal. *Id.* at 18; *McHaffie v. Bunch*, 891 S.W.2d 822, 830 (Mo. banc 1995). Changing the grounds for the objection or broadening the grounds is also prohibited. *Firestone v. Crown Ctr. Redevelopment Corp.*, 693 S.W.2d 99, 106–07 (Mo. banc 1985). An

appellate court will only reverse on a new basis for exclusion of evidence when plain error has occurred. *Nelson v. Waxman*, 9 S.W.3d 601, 605 (Mo. banc 2000).

*State v. Hoy*, 219 S.W.3d 796, 809 (Mo. App. S.D.2007).

Defendant filed a motion *in limine* to exclude the evidence because "the two transfers constitute prior uncharged misconduct and are not legally or logically relevant. . . ." Defendant also asserted that "[t]he circumstances of the charged crime and the transfers are so remote that the transfers become irrelevant. . . ." The trial court denied the motion *in limine* seeking to exclude the evidence. At trial, Defendant was permitted to approach the bench after the State's first question to Deputy Heidler about whether he had questioned Defendant about the electronic transfers. Counsel's objection was as follows:

> [defense counsel]: Your Honor, we would lodge an objection on these transaction[s] based on the foundation. Anything that Deputy Heidler states isn't based on his personal knowledge but what he may have seen on the internet or through other documents, and I think that's the best evidence. It[']s hearsay, and it lacks relevance.
>
> THE COURT: He asked if he talked to your client, that's the question.
>
> [defense counsel]: This is in regard to two electronic transfers.
>
> THE COURT: We're not there yet.
>
> [defense counsel]: Okay

After a few more questions on the topic, the deputy stated that Defendant's bank account showed two transfers, and defense counsel was permitted to approach again. That exchange was as follows:

> [defense counsel]: I believe this is the point where the State is going to try to introduce evidence of those two trans-

fers, and we would lodge our objection based on foundation, and there's already evidence of that, banks [sic] accounts were subpoenaed. Those haven't been produced. It[']s also hearsay based on those bank accounts.

THE COURT: Where are you going with this?

[prosecutor]: Your Honor, there is an admission. I'm simply trying to explain to the jury, in his conversation with [Defendant] she admitted that she transferred money from PIP to her personal accounts. And it won[']t make any sense to the jury if we don't give a little background as to why he's asking her about those. He's simply going to say that he had uncovered a couple of suspicious bank transfers and that he talked to her about those transfers, and that she admitted that yes, she had transferred the money to her account. And no, she had never paid any money back to PIP.

THE COURT: Okay. And your objection is what, now?

[defense counsel]: Well, for one, relevance. Second, improper foundation. And, last, its hearsay based.

THE COURT: It sounds like an admission against interest to me, objection overruled.

The trial court then denied Defendant's request for a continuing objection to any testimony about the electronic transfers,

and instructed Defendant to "make objections when you think you need to."

After the trial court denied a continuing objection, Deputy Heidler continued to testify about the electronic bank transfers. Defendant made only one more objection, and that objection was made only after the question had been asked and answered and was unaccompanied by any request that the testimony be stricken. Then, during cross-examination, Defendant's attorney also questioned Deputy Heidler about the electronic transfers, allowing the deputy to cover the same ground again.[7] By failing to timely lodge an objection each time a question sought to elicit this information, Defendant failed to preserve the issue for our review. *State v. Lloyd,* 205 S.W.3d 893, 900–01 (Mo.App. S.D.2006).

Strategy may evolve during a trial. A defendant who drops an objection to a certain line of questioning denies the trial court the opportunity to reconsider its previous rulings and for that reason is not allowed to later complain about the matter on appeal if the verdict goes against him. *See State v. McWhorter,* 240 S.W.3d 761, 764 (Mo.App. S.D.2007); *State v. Campbell,* 122 S.W.3d 736, 742 (Mo.App. S.D. 2004). Instead of continuing to dispute the admissibility of any evidence about the electronic bank transfers, defense counsel chose instead to attempt to minimize its impact using cross-examination and closing argument.[8]

---

7. Later, when the prosecutor raised both the garnishment and the electronic transfers in his closing argument, defense counsel did not object. Instead, Defendant's attorney also addressed both matters in his closing argument, telling the jury that taking the garnishment to Defendant's attorney was raised "just to make her look bad[ ]" and that Defendant had explained the electronic transfers.

8. Defendant also has not demonstrated that the admission of the evidence about which

she now complains "manifest[ed] prejudice affecting a substantial right." *State v. Hoy,* 219 S.W.3d 796, 810 (Mo.App. S.D.2007) (citation omitted). "Prejudice is not considered apparent when there is ample other evidence to support the conviction." *State v. Campbell,* 122 S.W.3d 736, 741 (Mo.App. S.D.2004) (citing *State v. Fuente,* 871 S.W.2d 438, 443 (Mo. banc 1994)). As noted in our review of Defendant's first point on appeal, there was ample evidence to support the jury's conclusion that Defendant had stolen more than $25,000

Defendant's final point is also denied, and the judgment of conviction is affirmed.

BATES, P.J., and BARNEY, J.

in cash. In light of the fact that the sum involved in the electronic transfers was minimal in comparison (and presumably could also have been included in the stealing

charges brought against Defendant), the evidence challenged in Defendant's fifth point was not so inflammatory as to be unduly prejudicial.